


**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARTHA BOYKIN, as Administratrix of the estate of Alvin D. Frazier, II, suing on behalf of Alvin D. Frazier, II, deceased,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:06-cv-850-JHH** |
| **SUN LOGISTICS GROUP, a foreign corporation doing business in St. Clair County, Alabama,** | ) | |
| **DEFENDANT.** | ) | |

**MEMORANDUM OF OPINION (DRAFT) AND ORDER**

The court has before it defendant's August 20, 2007 motion (doc. # 36) for summary judgment. Pursuant to the court's orders of August 28, 2007 (doc. # 39) and November 26, 2007 (doc. # 56), the motion (doc. # 36) for summary judgment is now under submission.

## I. Procedural History

Martha Boykin, as administratrix of the estate of Alvin D. Frazier, II, filed a complaint in this court on May 1, 2006 in essence alleging wrongful death against

Sun Logistics Group, Inc. ("Sun").[1] On August 20 and 21, 2007, defendant Sun filed a motion (doc. # 36) for summary judgment which included a brief in support thereof, and evidence (docs. # 37, 38) asserting that there are no genuine issues of material fact regarding plaintiff's claim and that defendant is entitled to judgment as a matter of law.[2] On September 19 and 20, 2007 plaintiff filed a response (doc. # 46) to defendant's motion for summary judgment and an evidentiary submission (doc. # 47). Defendant then filed a reply brief (doc. # 52) and included therein argument that certain of plaintiff's exhibits are inadmissible due to lack of authentication. Although the court provided the plaintiff an opportunity to file a supplemental brief in opposition to the motion for summary judgment (see doc. # 56), plaintiff has not done so.

The motion for summary judgment is considered herein.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

---

[1] Specifically, plaintiff alleges:

> The defendant Sun was responsible for stacking, distributing and/or otherwise managing the pallets and tires that fell on Alvin D. Frazier, II. (Compl. ¶ 14.) Defendant Sun's wrongful acts, omission and/or negligence caused said pallets to fall and strike Alvin D. Frazier, II in the head. (Compl. ¶ 15.)

[2] The gist of the motion for summary judgment is the asserted failure of plaintiff to come forward with evidence sufficient to provide a reasonable basis for a jury to conclude that it is more likely true than not true that Sun's negligent conduct was a cause in fact of the accident which resulted in Frazier's death.

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). Where, as here, the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial on those issues.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial

burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[3]

### A. Overview of the Facility

In 2005, TNT Logistics ("TNT") contracted with Michelin to perform warehousing services at a tire distribution center[4] in Moody, Alabama ("the Moody facility"). (See Doc. # 46 at 1, 4; see also Doc. # 36 at 3, ¶ 4.) TNT had a subcontract with Sun Logistics, Inc. ("Sun"), a company in the business of warehouse logistics. (See Doc. # 46 at 4; see also Doc. # 36 at 3, ¶ 4.) Sun was to provide certain services at the Moody facility, including unloading tires from delivery trucks and loading tires

---

[3] If facts are in dispute, they are stated in the manner most favorable to the plaintiff. See Fitzpatrick, 2 F.3d at 1115.

[4] TNT built the tire warehouse in Moody. Michelin underwrote the project and provided the line of credit for the construction of the warehouse. (Chambers notes during conference with the parties on June 20, 2007.)

onto outbound trucks for shipment to customers. (See Doc. # 46 at 4; see also Doc. # 36 at 3, ¶ 4.) TNT was to oversee Sun's actions. (See Doc. # 36 at 4, ¶ 5.)

The tires are delivered to the loading docks at the Moody facility in large tractor-trailers. (See Doc. # 46 at 5.) Sun employees, known as "lumpers" or material handlers, are then charged with the task of unloading the loose tires onto empty pallets.[5] (See Doc. # 36 at 4, ¶¶ 5-6.) One lumper would stand inside the truck and roll the tire to another lumper standing on the dock; the lumper standing on the dock would then stack the tire onto the pallet. (See id. at ¶ 7.) The tires are stacked by the lumper onto the pallet in accordance with Michelin's stacking pattern.[6] (See id. at 5, ¶ 8.) After the tires are stacked according to the specified stacking pattern, the lumpers place cones through the center of the tire stacks.[7] (See Doc. # 46 at 7.) The cones used on the loading dock are provided by TNT. (See Doc. # 36 at 5, ¶ 8.) A cone must be longer than the tire stack onto which that cone is placed, because the

---

[5] The empty pallets are placed on the loading dock by TNT employees. (See Doc. # 36 at 4, ¶ 7.) At certain times a Sun employee, the "pivot" man, "might help TNT put the pallet in the appropriate area to receive tires." (Id.) Sun was not responsible for purchasing the pallets. (See id. at 5, ¶ 8.)

[6] The method of storing tires used by Michelin at its warehouses including the Moody facility is an "industry practice of storing tires, but more specifically, Michelin has been storing tires like that for fifty, sixty years." (Clark Dep. at 29.) In fact, the stacking process used at the Moody facility is identical to the process being used at all other facilities. (See id. at 152.)

[7] Sun was not responsible for purchasing the cones used at the Moody warehouse. (See Doc. # 36 at 5, ¶ 8.)

cones on one pallet support the weight of the other pallet.[8] (See Doc. # 46 at 7.) A "built" pallet, containing the appropriate number of tires and cones, is referred to as a "unit load." (See id.)

During the time period in question, a Sun "pivot" would sometimes "stage" the pallets on the dock, meaning that the pivot employee would take a forklift and place one built pallet on top of another, stacking as such two pallets high. (See Doc. # 36 at 4-5, ¶ 7.) TNT would generally then take over the "putaway" responsibility, placing the unit load pallets via forklift into the appropriate place in the warehouse. (See id. at 4, ¶ 6; see also Doc. # 46 at 7-8.) On occasion, however, Sun employees performed the putaway process if TNT had a need for those services due to volume spikes or absenteeism. (See Doc. # 46 at 8.) During the putaway process, the unit loads are stacked "five high" and organized into "bins." (See id.) Bins contain either fifteen unit loads (five stacks high, three rows deep), ten unit loads (five stacks high, two rows deep), or five unit loads (five stacks high). (See id.) The organization of the bin depends on the space available in a specific aisle location. (See id.)

TNT corporate safety managers periodically conducted safety training visits of various facilities, including the Moody facility, to look for compliance training,

[8] It was a shared responsibility between TNT and Sun to insure the tires were correctly stacked on a pallet and TNT was the final check. (See Perez Dep. at 212.)

ensure that TNT was performing internal assessments of compliance and safety programs, meet with safety committees, and talk about safety.[9] (See Clark Dep. at 9-10, 109.) TNT also maintains employees responsible for bin maintenance. (See Clark Dep. at 136.)

**B. Supervisors and Employees at the Moody Facility**

1. Edgar Peres (a Sun employee)

Edgar Perez, a Sun project manager, was responsible for supervising the Sun employees, including lumpers and supervisors. (See Perez Dep. at 41-42.) In that capacity, Perez trained lumpers on the quality of unloading and stacking that Michelin required; for example, Perez trained the lumpers on topics such as the recognition of a good or bad pallet and a good or bad cone. (See Doc. # 36 at 6, ¶ 11.) As Sun did not require its employees to speak English, many of the lumpers spoke only Spanish. (See Perez Dep. at 41-42, 50-51, 68-69.) Although orientation videos were shown exclusively in English, visualizations of the required stacking patterns were shown to the lumpers and testing was done in Spanish. (See id. at 70-71, 77.)

[9] One such corporate safety manager visited the Moody facility approximately six weeks before the Frazier accident occurred. (See Clark Dep. at 9.) That manager did not make any negative report regarding unsafe conditions at the facility. (See id. at 12.)

2. Bobby Parham (a TNT employee)

Bobby Parham was a material handler for three years for TNT. (See Parham Dep. at 9.) In that capacity, Parham drove the forklift during "putaway."[10] (See id. at 13.) That is, after the pallet is prepared at the loading dock by Sun's lumpers, Parham would pick up the completed pallets with the forklift and stack them in the warehouse "in such a way that they fit evenly and balanced." (Id. at 31.) However, even when the forklift operator stacked the pallets "nice and neat and clean and straight," bin maintenance was often necessary. (Id. at 32.) In fact, TNT's material handlers such as Parham were trained to "look up" and see if anything required bin maintenance. (See id. at 35-36.) Parham says that the tires involved in the spill were original equipment tires and it looked to him as if he "put up most of them." (Id. at 87.) And Parham knows that he used good cones when he performed putaway at the bin in question. (See id. at 152.) Specifically, he testified: "all of my cones and pallets, especially the cones, would have been new. All of my pallets and cones would have been pretty much new." (Id. at 219.) Despite responsible stacking and bin maintenance, "we constantly had tire spills [at the time of the accident in question]," amounting to approximately "forty or fifty tire spills every two weeks."

[10] Parham testified that only TNT employees participate in the "putaway" process of original equipment ("OE") tires. (See Doc. # 36 at 14, ¶ 28.)

(Id. at 39, 171.) When asked why such falls occurred, Parham opined:

> Somebody could have went into the same bin I was in and pulled from that bin and put some tires back and not put it back straight.
>
> Or somebody could have tipped the bin that's behind the bin that I put my product in and made my bin shift. There was a lot of that also.

(Id. at 33.)

In fact, as to the night of the accident, Parham says:

> I did come up that aisle or I went down that aisle, I can't remember which one it was. And that's one of the things you look at when you're coming up the aisle; you look for anything that's leaning over into the aisle, and that was the center aisle.
>
> And I came up that center aisle and I didn't notice nothing leaning or nothing like that.

(Id. at 83.)

3. Terry Hendrix (a TNT employee)[11]

Terry Hendrix began working for TNT in 2003 as a floor associate. (See Hendrix Stmnt. at 8-9.) In that capacity, Hendrix was responsible for ensuring that trucks were unloaded correctly and put away correctly in accordance with procedures

[11] On August 28, 2007 plaintiff filed a motion (doc. # 40) to strike the sworn statements of Terry Hendrix and Kenneth Jennings. The court denied that motion by order (doc. # 56) dated November 26, 2007 but "in the interest of fairness" allowed plaintiff until December 20, 2007 to obtain voluntary verified rebuttal evidence from Hendrix and Jennings. The same order (doc. # 56) allowed plaintiff to file, if desired, a short supplemental brief in opposition to the motion for summary judgment by January 9, 2008. To date, plaintiff has filed no additional brief or evidence.

created by TNT. (See id. at 9.) After working for six months as a floor associate, Hendrix was promoted to inventory control. (See id. at 10.) In that capacity he was responsible for making sure everything came in correctly by checking for overages or shortages, checking for bad tires, and inspecting pallets and cones at the door. (See id. at 10-11.) Later, Hendrix began working as a safety associate. (See id. at 13-14.) Safety auditors were responsible for ensuring that the right pallets, cones, and cone patterns were used. (See id. at 28-29.) Safety auditors were also responsible for making random checks of bins to ensure that there were no bin problems that needed to be fixed. (See id. at 30.)

Hendrix described the working arrangement between Sun and TNT. (See id. at 15-16.)

> Q: Okay – you touched on the lumpers just a minute ago. How did the folks that worked for TNT work in conjunction with the Sun employees?
>
> A: We worked hand in hand. All the guys when I was on the floor were – we all worked hand in hand. If we had a problem, we would all fix it together. There wasn't none of this I said, he said or they did, we did. We all worked as a group.
>
> I know it was two separate companies, but we worked as one. That was the way it was handled.
>
> Q: Was that the instructions that you had from TNT, was to work in the way that you just described?
>
> A: No. But that is the way it was there. In the warehouse, there's a – at the dock place, we have markings on the dock. From a

certain area to the trailer itself, Sun Logistics was responsible for that. Once it came across the line, it was TNT's responsibility.

. . .

Q: Okay. So, when you would pick up some tires from where the lumpers had staged them, whose responsibility was it then?
A: The TNT employees.

Q: When I say "responsibility," I mean for putting away as well as for safety?
A: TNT.

Q: Okay. So when a floor associate would come to the area where the lumpers had staged the tires, was it their responsibility to inspect –
A: Yes, sir.

Q: – the pallets?
A: You inspect everything before you move it off that dock. If you're not happy with it or you think something is wrong, you don't move that pallet until they restack it and fix it. That's the way it's always been.

(Id. at 14-18.)

## C. The Accident

On November 6, 2005, TNT employees were performing inventory count[12] and

[12] In order to do the kind of inventory count being conducted that night, TNT had to "tear down the whole bin to count each pallet, to make sure the right number of tires is on there." (Parham Dep. at 60.)

bin maintenance[13] at the Moody facility – no shipping, putaways, or loading of tires was being performed by any Sun employee. (See Doc. # 46 at 12.) Frazier was assigned to count the tires and pallets in a specific bin location. (See id.) Between 3:00 and 4:00 a.m., two stacks collapsed and a pallet from one of the stacks struck Frazier in the head fracturing his skull and killing him. (See id.) The cause of death was determined to be blunt force trauma to the head. (See id.)

Terry Hendrix was working on the night of the accident. (See Hendrix Stmnt. at 31.)

> A: We came in that night – everybody came in at 11:00 o'clock that night. The other shift had just shut down. We came in to do wall-to-wall inventory. That's what we were doing. We were doing inventory, counting every tire in the building.
>
> (Id. at 32.)
>
> . . .
>
> A: [Right after lunch at 2 or 3 am], we heard on the radio that there had been a major tire spill and somebody was down.
>
> (Id. at 46.)
>
> A: I had to dig [Frazier] out. He was buried under tires. So I started throwing tires off of him.

[13] "Bin maintenance" crews were responsible for touring the warehouse to look for problems with the stacks such as leaning and misalignment. (See Clark Dep. at 51.) Decedent Frazier was a member of the bin maintenance crew. (See id.)

About the time I got him uncovered, that's when he started throwing up and all. He started choking. I rolled him over on his side, and that's when I saw that the back of his head was crushed where he had hit the concrete backwards . . .

(Id. at 52.)

A: The tires [involved in the spill] had come from a corner bin . . . where the tires fell was on a corner aisle. Those were tires that really had a lot of personal care to them because they're high dollar tires.

Q: How do you know that?
A: They were called OE tires, original equipment tires.[14] They're real expensive tires. They go directly to the car manufacturer.

When these tires come in, there are just certain people that fool with these type of tires. These tires had to be stacked in a very particular way, total care. That's where the company's money really comes from, these original equipment tires.

(Id. at 65.)

Q: Do you have any idea how long it had been since that particular bin had been checked?
A: That bin had just been checked prior to them falling. Those tires had just been cycle counted.

Q: Who would have done that?
A: On that particular aisle, I think they said Kenny Jennings had just

[14] Edgar Perez testified that it was a TNT employee who putaway the tires involved in the spill because Sun employees did not putaway original equipment tires. (See Perez Dep. at 153-54.) Glen Clark also testified that the spill involved original equipment tires and that original equipment tires require a special protocol to be followed during putaway. (See Clark Dep. at 113-14.)

> cycle counted those tires.[15]

(Id. at 69.)

Hendrix further testified that the nature of the spill was somewhat unusual. "Usually, a tire spill doesn't fall in that direction. When these tires fell, they fell at an angle, like a tree. They fell to the left instead of forward or reverse . . . so that is what made a lot of us think what had happened." (Hendrix Stmnt. at 70-71.)

Glen Clark, Director of Safety Training and Operations Services for TNT, investigated the accident. (See Clark Dep. at 5-6, 140.) During his investigation, Clark learned that Frazier was off of his forklift when he was struck by the falling tires.[16] (See id. at 91, 140.) Clark came to the conclusion that something heavy such as a forklift must have struck the bin in question to cause it to come down. (See id. at 90-91, 143-45.)

> I have been in this industry, worked around this ever since we've been involved in this contract. We have managers who have many years of experience. I know how the tires are stacked. I know how their consistency is, and these things just don't fall. There has to be

[15] Kenny Jennings began working for TNT at the Moody facility in November 2003 as a forklift operator. (See Jennings Stmnt. at 6, 29.) On the night of the accident, Jennings was working in inventory control cycle counting tires from his lift. (See id. at 5, 12-13.) He had gone by the corner stack shortly before it fell and saw no problem with it. (See id. at 13.) It did not appear to be leaning or damaged. (See id.) In fact, the tires appeared to be stacked properly. (See id. at 29.) Also, see footnote 11, supra.

[16] Although inventory counters are permitted to leave the forklift as necessary to complete their job, the majority of the inventory count is done from the lift. (See Clark Dep. at 139.)

> something that drives an impact and that would cause this type of what I would say major fall of grouping. There had to be something that caused that.

(Id. at 143.)

The Moody Police Department ("MPD")[17] and the Occupational Safety and

---

[17] To the extent that defendant Sun seeks to strike plaintiff's exhibits 8, 9, and 11 from consideration on summary judgment (see doc. # 52), such motion is **GRANTED**. Exhibit 8 is a copy of a document titled "Alabama Uniform Incident Report" and Exhibit 9 is purportedly a supplement thereto. Exhibit 11 purports to be a copy of Frazier's death certificate and additional documents bearing the name of the St. Clair County Coroner's Office. None of the information in either of those exhibits has been authenticated by deposition or affidavit. Therefore, the police and coroner reports constitute hearsay and are inadmissible at summary judgment. See In re Boshears, 110 F.3d 1538, 1542 n. 4 (11th Cir. 1997), citing FED. R. EVID. 805; see also United States v. Barrentine, 591 F.2d 1069, 1082 (5th Cir. 1979) and United States v. Halperin, 441 F.2d 612, 618 (5th Cir. 1971).

To the extent that defendant Sun seeks to strike plaintiff's exhibits 18 and 19 from consideration on summary judgment (see doc. # 52), such motion is **MOOT**. Exhibits 18 and 19 purport to be audio CDs of interviews conducted by the Moody Police Department regarding the accident which caused Frazier's death. While their admissibility is questionable at best, any ultimate decision on admissibility would be purely academic as those exhibits are cited exactly twice in plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (doc. # 46):

> "Employees reported to the police that pallets fall all the time and that it was not unusual for pallets to fall." (Doc. # 46 at 13, citing Exhs. 18 and 19, Audio Interviews Conducted by the Moody Police Department.)
>
> "Further, members of the Moody Police Department interviewed Frazier's co-workers as part of an investigation into whether Russell intentionally caused the tire spill." (Doc. # 46 at 25 n. 1, citing Exhs. 18 and 19, Audio Interviews Conducted by the Moody Police Department.)

The first citation is established in the record before this court with evidence other than exhibits 18 and 19. The second citation sheds no light on the elements of causation at issue at the summary judgment stage of this case. Therefore, defendant's implied motion to strike (see doc. # 52) as to these two exhibits is moot.

Health Commission ("OSHA")[18] investigated the accident.

## IV. Applicable Substantive Law and Analysis

### A. Legal Framework

It has been axiomatic, at least since Palsgraf v. Long Island R. Co., that no claim for negligence can lie without duty, breach, causation, and injury. 162 N.E. 99, 99-100 (N.Y. 1928) ("In every instance, before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual

---

[18] To the extent that defendant Sun seeks to strike plaintiff's exhibit 12 from consideration on summary judgment (see doc. # 52), such motion is **GRANTED**. Exhibit 12 purports to be a statement made by Edgar Perez to OSHA. That document, however, is unsigned and undated by the witness. Perez was deposed in this case and was asked to authenticate a statement that he made to OSHA. (See Perez Dep. at 254-55.) Perez authenticates the OSHA statement presented to him at deposition (Exhibit 14 to the deposition), as one that was signed and dated on January 6, 2006. (See Perez Dep. at 255.) Unfortunately, exhibit 14 to the Perez deposition is not contained in the evidence before this court. Instead, exhibit 12 of plaintiff's evidentiary submission, which could be the same document referenced in the Perez deposition, has no signature, no date, and no other authenticating information. Such report is not trustworthy under FED. R. EVID. and is therefore inadmissible. However, Perez's deposition testimony regarding exhibit 14 attached to his deposition is, of course, admissible.

To the extent that defendant Sun seeks to strike plaintiff's exhibits 13 and 14 from consideration on summary judgment (see doc. # 52), such motion is **GRANTED**. Those documents purport to be transcripts of interviews conducted by OSHA. However, neither of those documents are signed, dated, or even begin to purport whom is being interviewed. Without such essential and minimal authenticating information, those exhibits are inadmissible at summary judgment. See FED. R. EVID. 803(8)(C).

complaining, the observance of which would have averted or avoided the injury.") (internal citations omitted); see also Proctor v. Fluor Enter., Inc., 494 F.3d 1337, 1346 (11th Cir. 2007) (internal citations omitted) and Lamb by Shepherd v. Sears, Roebuck & Co., 1 F.3d 1184, 1188 (11th Cir. 1983) ("To prove his claim for negligence, [plaintiff] must show that [defendant] breached some duty owing to him and that said breach was the proximate cause of [plaintiff's] injuries."). Of these elements, proximate cause[19] is often the stickiest and is generally determined by the fact-finder. See Belew v. United States, 2007 WL 3023127, No. 07-12881 at *2 (11th Cir. Oct. 17, 2007), citing Green v. Alabama Power Co., 597 So.2d 1325, 1328 (Ala. 1992). However, proximate cause may be decided on summary judgment if "there is a total lack of evidence from which the fact-finder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury." Belew, 2007 WL 3023127 at *2, citing Green, 597 So.2d 1325. That is, the plaintiff bears the burden of introducing some evidence which affords a reasonable basis or inference for a jury to conclude that it is more likely than not that the conduct of the defendant was a

---

[19] Proximate cause is defined as the cause which in a natural and continuous sequence, unbroken by any new and independent cause, produces an event and without which cause such event would not have occurred. And in order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event or some similar event might reasonably result therefrom. There may be more than one proximate cause of an event. See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 272 n. 27 (5th Cir. 1980).

cause in fact of the result. See Lamb by Shepherd, 1 F.3d at 1191. But "[a] mere possibility of such causation is not enough; and when the matter remains one of *pure* speculation or conjecture, . . . it becomes the duty of the court to direct a verdict for [defendant]." Id. (internal citations omitted) (emphasis added); see also Chapman v. Am. Cyanamid Co., 861 F.2d 1515 (11th Cir. 1988) ("[A]n inference based on speculation and conjecture [at the summary judgment stage] is not reasonable.") and Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321 (11th Cir. 1982) ("The standard for determining whether an inference is allowable is generally whether it is a reasonable one, that is, whether it is one that 'reasonable and fair minded men in the exercise of impartial judgment' might draw from the evidence.") (quoting Boeing Co. v. Shipman, 411 F.2d 365, 368-70 (5th Cir. 1969) (en banc)).

**B. Plaintiff's Evidence of Proximate Cause**

Plaintiff contends that she has presented substantial evidence that a cause of Frazier's death was Sun's negligence in failing to secure unit loads against slide or collapse. (See Doc. # 46 at 18-22.) OSHA regulation codified at 29 C.F.R. § 1910.176(b)[20] and two experts[21] are cited in support of this position.[22] (See Doc. # 46

---

[20] Plaintiff also attempts to use at summary judgment, in purported showing of proximate cause, the OSHA Citation and Notification of Penalty (see doc. # 47, exh. 15) brought by OSHA against Sun as well as Sun's Stipulation and Settlement Agreement (the "Agreement") with the Department of Labor (see doc. # 47, exh. 16), agreeing to abate the violation by improving work instructions on stacking tires and identifying and using proper storage materials. Construing defendant's Reply Brief to the Plaintiff's Response to Defendant's Motion for Summary

Judgment (doc. # 52) as a motion to exclude those exhibits 15 and 16 from the court's consideration at summary judgment, such motion is **GRANTED**.

In a diversity case such as this, federal law governs the admissibility of evidence. See Johnson v. Ellis & Sons Ironworks, Inc., 604 F.2d 950 (5th Cir. 1980). Federal Rule of Evidence 803(8)(C) allows into evidence public reports that: (1) set forth factual findings; (2) are made pursuant to authority granted by law; and (3) the judge finds trustworthy. Importantly, Rule 803(8)(C) does not provide for the admissibility of the legal conclusions contained within an otherwise admissible public report. See Hines v. Brandon Steel Decks, Inc., 886 F.2d 299, 302 (11th Cir. 1989). Legal conclusions are inadmissible because the jury would have no way of knowing whether the preparer of the report was cognizant of the legal requirements underlying the legal conclusion and, if not, whether the preparer might have a higher or lower standard than the law requires. See id. at 303. Just as importantly, the Advisory Comments to the rule set forth several considerations to aid in determining the trustworthiness of a public report: the timeliness of the investigation; the skill and experience of the investigator; whether the investigator held any sort of a hearing; and the investigator's impartiality. See id. The court notes that OSHA investigators stand in a unique position because federal law generally prohibits them from testifying in private civil litigation. See id., citing 29 C.F.R. § 2.20 *et seq.* Finally, public reports otherwise admissible under Rule 803(8)(C) may nonetheless be excluded in whole or in part if the trial court finds that they are either irrelevant or more prejudicial than probative. See id. at 302, citing United States v. MacDonald, 688 F.2d 224, 230 (4th Cir. 1982) (although otherwise admissible under Rule 803(8)(C), report was properly excluded where it would not help the jury with ultimate issue of case and would be confusing.).

In this case, not only is the admissibility of Exhibits 15 and 16 questionable at best under FED. R. EVID. 803(8)(C) but it is the judgment of the court that those exhibits are unquestionably inadmissible under FED. R. EVID. 403. The central question at issue in this case is whether any negligence on the part of Sun proximately caused the accident which killed Frazier. The citation, purportedly evidencing violation of OSHA regulations, does not lead to the conclusion of negligence per se. It serves to follow, then, that any Agreement related to the citation will not constitute negligence per se. Thus, allowing those exhibits into evidence is more prejudicial than probative and will not be allowed.

[21] Although generally calling into question the qualifications and opinions of plaintiff's experts, defendant has not filed a motion to strike the expert testimony under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). (See Doc. # 36 at 55, n. 14.) This court has no duty to intervene on its own initiative and convene a Daubert hearing for the purpose of ascertaining whether an about-to-be introduced expert opinion is reliable. See United States v. Frazier, 387 F.3d 1244, 1273 n. 1 (11th Cir. 2004) (Tjoflat, J., specifically concurring).

[22] Plaintiff also bases her proximate causation argument on Black Belt Wood Co. Inc. v. Sessions, 514 So.2d 1249, 1250-52 (Ala. 1987) which she contends is factually similar to the

at 19-22.)

### 1. OSHA Regulations

Plaintiff presents the Occupational Safety and Health Administration ("OSHA") regulation at 29 C.F.R. § 1910.176(b), which provides that material stored in tiers should be secured to guard against sliding and collapse, as purported evidence of proximate cause. (See Doc. # 47, Exh. 15.) Although the *violation* of OSHA regulations can be evidence of negligence in certain circumstances, see Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231, 1238 (5th Cir. 1982), even *violations* of OSHA regulations do not alone constitute negligence per se. Thus, the regulation itself (doc. # 47, exh. 15) is only relevant to Sun's *duty* to act in accordance with OSHA's standard of care and does nothing to establish proximate cause. Plaintiff's

---

case at hand. In Black Belt, the Alabama Supreme Court held that Black Belt's negligence in loading logs on the truck was the proximate cause of the decedent's death. See id. at 1251-52. Black Belt argued that negligence in loading the logs could not have been the proximate cause of the accident because it was the duty of the driver to keep the logs properly secured by chains and the driver's failure to perform that duty broke the causal connection between the alleged negligence and the injury. See id. at 1251, citing Vines v. Plantation Motor Lodge, 336 So.2d 1338 (Ala. 1976). The Alabama Supreme Court rejected this argument, stating:

> In this case, Black Belt should have reasonably foreseen an injury occurring. The evidence in this case is that these big logs frequently fall off trucks and that complaints had previously been made to Black Belt that some of the trucks had been improperly loaded. Black Belt did nothing to change its practices before this accident occurred and, by the time of trial, had made no changes in its method of operation.

Id. at 1252.

expert testimony must therefore establish proximate cause in order for this case to survive summary judgment.

### 2. The Expert Testimony

Terrence Grisim, a certified safety professional, and Marshall White, a consultant offering information to clients to help them improve material handling and deficiency of packaging, distribution, and logistics systems are offered by the plaintiff to establish causation. (See Doc. # 46 at 19-22; see also Doc. # 36 at 28, ¶ 63 and 34-35, ¶ 82.)

#### a. The Testimony of Terrence Grisim

Grisim criticizes the overall system of tire warehousing used at the Moody facility and draws the following conclusions in his expert report:

> Although no one saw this accident happen it was entirely foreseeable. The system in place of piling 5 pallets high with tires covered with a slippery coating without the use of racks was dangerous and unstable . . .
>
> In my 38 years of warehouse safety experience I have never seen anything like this attempted, let alone on this scale and with such poor training and supervision.[23] Any miscalculation in handling in a bin or an adjacent bin could cause collapse. There is no margin for error in this system and few controls in place to prevent the errors . . .

---

[23] Grisim has never seen the alternative tire warehouse stacking procedure that involves steel cages or racks, referred to *infra* at page 26, in discussion of the testimony of Marshall White. (See Grisim Dep. at 51.)

> Most of the time their tire spill, when they saw it, was with a missing pallet, missing a cone or the pallets were mis-stacked on top of the other or they were shifted and they didn't put them even and everything would start leaning . . .
>
> It is my opinion Mr. Frazier's death was caused by Sun Logistic's negligent implementation of a dangerous system.

(See Doc. # 47, Exh. 7 at 2-3.)

The findings presented in the report were clarified during Grisim's deposition.

> A: What I mean is that the system itself as I mentioned earlier and we have discussed extensively to me is flawed to start out with and the fact that there was not proper training on this crucial quality control issue that Sun provided here by the construct of these loads that were then made into bins because if you will if you want to make the analogy of someone baking a cake, you know, with TNT and Sun and everybody in the process here, Sun had the upfront duty to configure these loads, and if they weren't configured properly it just made it *much more likely* that they were going to fall when they got put out in the warehouse.
>
> Q: But you can't say that that is, in fact, what caused them to fail in this instance though, can you?
> A: I can't tell you precisely, no.
>
> Q: You qualify things at the end of page 3 there as these are my preliminary opinions?
> A: That's correct.

(Grisim Dep. at 84-85) (emphasis added.) In fact, Grisim readily admits that in order for Sun's negligence to have caused the accident in this case, Sun employees must have used bad pallets, bad cones, or an improper tire stacking pattern. (See id. at

112.) But Grisim has no idea and no opinion as to whether an improper stacking pattern was actually used for the tires that were involved in the spill. (See id. at 71.) Similarly, he offers no opinion as to whether the condition of the pallets and cones involved in the spill did or did not cause the accident. (See id. at 73.) In fact, Grisim admits that cone and pallet failure are outside the area of his expertise and he does not offer any opinion or inference that the components involved in the accident failed of their essential purpose.[24] (See id. at 80, 94.) Simply stated, Grisim does not have any opinion as to what caused the stack of tires involved in the accident to fall. (See id. at 74-75, 99.) It could have been the use of a bad pallet or cone, or the use of an improper stacking procedure, or some outside force hitting the stack. (See id. at 74, 89, 91.) Or, it could have been due to movement of the bins by forklifts or pickers.[25]

---

[24] Grisim defers to White for expertise on these issues. (See Grisim Dep. at 72.)

[25] Q: And you go on in that paragraph to talk about miscalculation in handling a bin or adjacent bin could cause collapse. Is that you referencing the potential that in the warehouse somebody with a forklift or picker that's handling tires or stacking them or unstacking them that this system that is set up lends itself to instability?

A: Yes, there are at least two issues that come to mind right away. As Dr. White said it is very, very common – I measured the boom height on those – on that forklift when I was down there and the boom height is 21 feet. At that height you're up – I forget if it's 3 or 4 stages of mast. You got a lot of mechanical slop in the process with a weight that high up in the air, and if the operator is not really diligent about making sure that the pallet he's picking up is completely clear of the one underneath, he can drag – he can drag it over the pallet underneath and cause it to collapse.

And secondarily I recall in Perez's deposition, and I saw physically when I was down there, that these bins are just literally touching each

(See id. at 93.)

Notwithstanding his lack of opinion on the actual cause of the accident, Grisim testifies that had a bad pallet, cone, or stacking procedure been used, such incident would have been attributable to the deficient training of Sun employees. (See id. at 68.) Most Sun employees could not read or speak English and training programs which originated from TNT were prepared in English. (See id. at 66-67.) This is problematic because Sun lumpers:

> served a very crucial function in the process that they were performing a quality control function as well as doing the labor. They were charged with assessing the fact that the pallets were in good enough condition, they could be safely used, and the cones were in good condition and could be safely used.
>
> So any – and, of course, the stacking patterns were crucial. All of this type of thing and the fact that there isn't anything that exists that I found in discovery that shows me that there was a reliable way to impart this

---

> other and any kind of misalignment when you're trying to take a pallet out could catch the stack next to it and destabilize it.
>
> Q: Could I generally describe that as a criticism of the process?
> A: Yes.
>
> Q: That's selected. That lends itself to pallets as they're being put away or taken down bumping each other?
> A: Causes destabilization, yes.
>
> Q: Can we generally describe that criticism as this process has a narrow margin of error for the operator of the picker or forklift?
> A: Yes.

(Grisim Dep. at 76-77.)

crucial information to the employees.

(Id. at 67.) Grisim contends that the problem was exacerbated because the lumpers' compensation scheme encouraged them to work quickly instead of safely. (See id. at 67, 79.)

**b. The Testimony of Marshall White**

White also criticizes the general tire storage process at the Moody facility.

> The process of storing unit loads of tires is inherently less stable than the more common industry practice of using steel stacking frames also called portable racks. Cones are not attached to pallet decks. The 11" diameter of the cone is significantly less than the hole diameter of the tires. Therefore, there is very little resistence to horizontal movements which result in significant instability. Cones also, due to wear, are not uniform in length. Therefore, pallets placed on top of the cones will not be supported flat and uniformly and therefore are unstable. Using this practice of cones with the normal variation of handling procedures by forklift operators results in unsafe conditions as evident by the historic number of spills that occurred at the TNT Logistics location in Moody, Alabama . . .
>
> Using the more common industry practice of stacking frames would have *significantly reduced the likelihood of spills* such as that which resulted in Mr. Frazier's death. The unit load design based on cone supports of tires within unit loads stacked 5 high is inherently unstable and is a flawed unit load design.

(Doc. # 47, Exh. 5, Expert Assessment of White at 4) (emphasis added.) White came to these conclusions after inspecting the pallets and cones reportedly involved in the spill. (See White Dep. at 81-82.) Upon inspection of those components, White

found: (1) Pallet 1 – over one half of the end board width was missing full length;[26] (2) Pallet 36 – end board was broken completely through;[27] (3) Pallet 21 – adjacent deckboards were 1-1/16" and ½" thick; (4) Pallet 9 was significantly out of square;[28] (5) cone width varied by more than 1";[29] and (6) two plastic cones were discovered among the 42 cones inspected. (See Doc. # 47, Exh. 5, Expert Assessment of White

---

[26] White does not know where in the stack configuration Pallet 1 was before it fell. (See White Dep. at 150.) Such information would be important for a person to know if an attempt were made to try to assess how much blame to place on that particular defective product. (See id.)

[27] Again, White does not know where in the stack configuration Pallet 36 was before it fell. (See White Dep. at 151, 153.) How much the defect in that pallet affected the stability of the stack is difficult to say because it depends on where the pallet was located in the stack before the fall, which is unknown to White. (See id. at 153.) In fact, whether the damage to Pallet 36 predated the accident is unknown to White. (See id. at 166, 167.)

[28]

Q: Okay. "Pallet 9 was significantly out of square," you said. Do you know what impact that had?

A: That particular defect is a type of defect that takes a tremendous amount of force to cause in a pallet. And in materials handling, there are only two types of forces that can cause that in a pallet like this, which is an extremely big heavy pallet. One is dropping on a corner, the other is hitting it with a forklift on a corner.

That is the type of defect that could have occurred during the accident. If it occurred prior to the accident, it's effect could be significant. Because now we've got a stacking system that's fundamentally designed around a rectangular base that's no longer rectangular. But it is also a type of defect that could have happened during the accident.

(White Dep. at 174-75.)

[29] According to White, only two or three cones varied by more than one inch. (See White Dep. at 180.) "The vast majority fell into similar in length category." (Id. at 181.) White does not know where any of the cones were in the stacking pattern. (See id.)

at 3.) But White admitted that he was not in a position to assess how much if any blame to put on a particular defective pallet or cone. (See White Dep. at 150-60, 200-01.) ) "[The defects] had an impact on the integrity [of the load]. But the level of impact, you cannot say without [placement in the stack] knowledge." (Id. at 187.) In fact, White stopped short of opining that the named defects actually caused the accident in question.

> Q: Okay, Well, are you going to offer an opinion that the pallets in this case failed?
> A: In my report, I indicate that the pallets I inspected, there were defects in them.
> Q: Do you have an opinion that the defects in the pallets caused them to fail so that they didn't perform as they were designed to perform?
> A: The defects – the defects in the pallets *would have limited their performance as they were designed to perform*.

(White Dep. at 81-82) (emphasis added.) Asked the causation question again differently, "do you have an opinion as to whether there was a component failure in this stack that caused it to spill?," White replied:

> A: There were defects in components, based on my inspection, that certainly would have made a spill more likely to occur than if those defects were not present.
> Q: But you can't say that X defect or X, Y, and Z defects caused this tire spill?
> A: I was not there to observe it occur. I could not say.

(White Dep. at 149.)

In an effort to determine causation, White conducted a stability analysis by taking the worst possible combination of defects in pallets and cones. (See id. at 225-26.) He determined that such a situation rendered the tires "highly susceptible" to a spill, but spontaneous "only if the plastic cones were located and would creep-deform."[30] (Id. at 226.) In describing the lean associated with the worst case scenario, White believes that such a situation would be very visible and should have been easily observable to somebody who was doing an inspection of the bin. (See id. at 271.) Again, however, while not enough to cause a spontaneous collapse, the situation "could contribute to the collapse coincident with an applied force and/or improper stack alignment." (Id. at 241.)

> Q: So is it your opinion, then, that in order for this stack to have fallen, under the worst-case application, there would have had to have been some other force applied, such as somebody would have had to have improperly stacked them or bumped it or maybe some other scenario; right?
>
> A: That's correct.

(Id. at 248.)

> Q: So are you able to quantify which is your opinion more likely in this scenario, improper stack alignment or applied force? Or do you know?
>
> A: I don't know.

[30] It is impossible to tell in this instance where the plastic cones were located in the stack configuration and also whether they creep deformed. (See White Dep. at 226, 242.)

(Id. at 256.)

Finally, White admitted that even had Sun employees chosen properly functioning pallets and cones, a TNT forklift driver could in some way have altered or bumped or changed the configuration so as to have diminished the integrity of the unit load. (See id. at 208.)

> Q: So I mean, are you here to be able to say, hey, this is what happened that caused this spill? Or are you here saying, these are the several possibilities of what caused this spill?
> A: This system and these defects and components make the spill much more likely to happen.

(Id. at 250-51.)

### C. Application of the Evidence to the Law and Decision

Negligence alone does not afford a cause of action and so Sun's purported failure to properly secure unit loads against sliding or collapse cannot on its own defeat the motion for summary judgment. See Lamb by Shepherd v. Sears, Roebuck & Co., 1 F.3d 1184, 1188 (11th Cir. 1983); see also Vines v. Plantation Motor Lodge, 336 So.2d 1338, 1339 (Ala. 1976). To survive summary judgment, plaintiff must come forward with some evidence which affords a reasonable basis or inference for a jury to conclude that it is more likely than not that the conduct of the defendant was a cause in fact of the accident which led to Frazier's death. See Lamb by Shepherd,

1 F.3d at 1191.

**(To be continued, if necessary.)**

## ORDER

The foregoing final draft ends:

> To survive summary judgment, plaintiff must come forward with some evidence which affords a reasonable basis or inference for a jury to conclude that it is more likely than not that the conduct of the defendant was a cause in fact of the accident which led to Frazier's death. See Lamb by Shepherd, 1 F.3d at 1191.

With this standard in mind, the court recognizes that a resolution of the motion (doc. # 36) for summary judgment requires the court to address a single question – is the plaintiff's evidence of proximate cause enough? On one hand, plaintiff has established that tire spills occurred frequently at the Moody warehouse and that the tire stacking method used by Sun employees made the tires highly susceptible to fall. On the other hand, defendant has established that the stack involved in the spill was not leaning or otherwise noted to be unsafe minutes before the accident. Even plaintiff's expert testified that the lean associated with the worst case scenario of bad pallets and bad cones would have been very visible and should have been easily observable to someone completing an inspection of the bin.

The parties are now equipped with much insight into the court's thought

process regarding this case. Now the parties are encouraged to resolve this matter amongst themselves and short of trial, by direct negotiations and/or by mediation by a responsible, proven successful, highly qualified member of the Bar familiar with the issues embraced herein. To that end, the court requests counsel for plaintiff promptly to discuss with counsel for defendant whether this action may be suitable for mediation and/or whether a settlement conference with the court would be conducive to settlement. The parties are **DIRECTED** to jointly file with the court a document outlining the results of this discussion **no later than March 19, 2008**. After receiving said report, the court will make a determination as to whether a final order should forthwith be entered regarding the motion (doc. # 36) for summary judgment.

Each attorney is further **DIRECTED** to immediately forward a copy of the enclosed memorandum of opinion and this order to his or her client.

**DONE** this the 26th day of February, 2008.

James H. Hancock

SENIOR UNITED STATES DISTRICT JUDGE